UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/9/2020

SHIQIU CHEN and CHANGREN ZOU, on
behalf of themselves and others similarly
situated,

                       Plaintiffs,

       - against -

H.B. RESTAURANT GROUP, INC. d/b/a
Hunan Balcony, SG 98 RESTAURANT
GROUP, INC. d/b/a A New Saigon, J & K
RESTAURANT GROUP, INC. d/b/a Szechuan
Gourmet d/b/a Szechuan Garden, JOHN DOE
CORPORATION, INC. d/b/a Szechuan
Garden, JENNY SHUCHEN WU, and ZUN BI
CHEN,

                       Defendants.

------------------------------------------------------------X

16 Civ. 2005 (RWL)

**DECISION AND ORDER**

**ROBERT W. LEHRBURGER, UNITED STATES MAGISTRATE JUDGE.**

Plaintiffs Shiqiu Chen and Changren Zou, on behalf of themselves and similarly situated individuals, brought this action to recover unpaid wages, overtime wages, and other damages under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA"), and the New York Labor Law, N.Y. Labor Law § 650 et seq. (the "NYLL"). Defendants H.B. Restaurant Group, Inc. d/b/a Hunan Balcony, SG 98 Restaurant Group, Inc. d/b/a A New Saigon, J&K Restaurant Group, Inc. d/b/a Szechuan Gourmet d/b/a Szechuan Garden, John Doe Corporation, Inc. d/b/a Szechuan Garden (collectively, the "Corporate Defendants") are restaurants doing business at various periods in Manhattan. Plaintiffs allege that Jenny Shuchen Wu ("Defendant Wu") and Zun Bi Chen ("Defendant Chen") (collectively, the "Individual Defendants") are the owners and operators of the Corporate Defendants.

1

A three-day bench trial was held on May 15, 16, and 29, 2019. Thereafter, the parties each submitted proposed findings of fact and conclusions of law. (Dkt. 129, 133.) The Court observed the demeanor and testimony of the witnesses during trial and has carefully considered the parties' submissions and arguments.

In accordance with Federal Rule of Civil Procedure 52(a), this Decision and Order constitutes the Court's findings of fact and conclusions of law.[1] For the following reasons, the Court finds that Plaintiffs have not met their burden of proof to establish any basis for liability against Defendants. Accordingly, the Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and close the case.

## Procedural History

The Court will briefly recount the relevant procedural history. The Complaint was filed on March 17, 2016 (Dkt. 1) and the First Amended Complaint ("Complaint"), now the operative pleading, was filed on December 29, 2016. (Dkt. 68.) The matter was initially assigned to the Honorable Lorna G. Schofield, U.S.D.J., and the Honorable James C. Francis IV, U.S.M.J. (Dkt. 1.) The Court granted several extensions of time, resulting from the substitution of Defendants' counsel and delays by Plaintiffs in complying with discovery deadlines. (Dkt. 36-37.) On September 20, 2016, the parties consented to the jurisdiction of Judge Francis for all purposes pursuant to 28 U.S.C. § 636(c). (Dkt. 41.) The case was reassigned to the undersigned on November 1, 2017 upon Judge Francis' retirement.

---

[1] To the extent any finding of fact includes conclusions of law, it is deemed a conclusion of law and vice versa.

Defendants filed their Answer on September 21, 2016.[2] (Dkt. 43.) The Court entered a Civil Case Management Plan and Scheduling Order on November 9, 2016. (Dkt. 62.) Defendants filed a motion for partial summary judgment but withdrew the motion about two months later. (Dkt. 80.) Discovery closed on November 10, 2017, and the parties submitted a Joint Final Trial Report on December 18, 2017. (Dkt. 95.) Following several adjournments, a pretrial conference was held on September 18, 2018. (Dkt. 101.) Trial dates were selected for March 2018, but then adjourned to May 15 and 16, 2018. (Dkt. 118.) An additional day of trial was added for May 29, 2019. (Dkt. 121.)

Following trial, Plaintiffs submitted Proposed Findings of Fact and Conclusions of Law on September 2, 2019 ("Pl. Br."). (Dkt. 129.) Defendants submitted their Proposed Findings of Fact and Conclusions of Law on October 14, 2019 after receiving two extensions to do so ("Def. Br."). (Dkt. 133.)

## Findings of Fact

During three days of trial, Plaintiffs called two witnesses: Changren Zou (T. 6-114) and Shiqiu Chen.[3] (See T. 114-208.) Defendants called one witness: Jenny Shuchen

---

[2] Defendants answered the initial Complaint (Dkt. 43), but never filed an answer to the First Amended Complaint. (Dkt. 68.) The First Amended Complaint added Zun Bi Chen as a named Defendant, and an Affidavit of Service on Defendant Chen shows that he was served on December 30, 2016. (Dkt. 72.) Defendant Chen has not filed any responsive pleading, nor has he appeared in the action. According to filings by Defendants' counsel, Mr. Richard Morel, his office only represents Defendants H.B. Restaurant Group, Inc., J&K Restaurant Group, Inc., and their owner Jenny Shuchen Wu. (See, e.g., Dkt. 133.) Accordingly, Defendant Chen appears to be in default. However, Plaintiffs never moved for a default judgment against him, and proceeded to trial against the appearing Defendants.

[3] "T." refers to the trial transcript from the proceedings held on May 15 and May 16, 2019, which begins at page 1 and extends through page 294. "T2" refers to the transcript from the third day of trial on May 29, 2019, which restarts at page 1 and extends through page 44 because of the use of a different court reporter.

Wu.[4]  (*See* T. 217-290; T2. 3-36.)  All witnesses testified through a Chinese-language interpreter.

While FLSA and NYLL trials often focus on factual disputes regarding employees' hours, the nature of the work performed, or employers' qualifications for coverage under the relevant statutes, the instant trial instead focused on whether Plaintiffs actually worked for Defendants at all.  The primary factual issue before the Court, as shown below, was whether and when Plaintiffs worked for a restaurant owned by Defendant Wu – the predicate to finding liability under the FLSA or NYLL.  The Court will begin with a summary of Plaintiffs' testimony, followed by Defendant Wu's testimony.

## A.     Plaintiffs' Employment

### 1. Plaintiff Zou

Plaintiff Zou worked for two restaurants called Hunan Balcony and A New Saigon, both located at 2596 Broadway, New York, NY 10025 ("2596 Broadway") at different time periods.  He also worked for Szechuan Garden, located at 239 West 105th Street, New York, NY 10025 ("239 West 105[th] Street").  (T. 6-7.)

Zou's work began at Hunan Balcony.  From July 1, 2012 to December 31, 2012, he largely delivered food orders and performed other ministerial labor (e.g., cutting cardboard, cleaning the sidewalk and wiping windows).  (T. 8, 10, 12.)  He first learned

---

[4] The Court does not venture to summarize the full trial testimony of all witnesses, but instead discusses the trial testimony most relevant to its present findings.  *See Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 399 Fed. App'x. 637, 639 (2d Cir. 2010) (summary order) ("Rule 52(a) requires the court to make sufficiently detailed findings to inform the appellate court of the basis of the decision to permit intelligent appellate review . . . . [It] does not require either punctilious detail [ ] or slavish tracing of the claims issue by issue and witness by witness." (internal quotations omitted));  *see also Williams v. Bethel Springvale Nursing Home, Inc.*, No. 14 Civ. 09383, 2018 WL 3344217, at *3 (S.D.N.Y. July 9, 2018) (same).

about the job opening from a friend, and then spoke with the manager there named "Ah Pao," who told Zou he could begin working.[5]  (*Id.*)

Zou testified that he worked at Hunan Balcony for six days per week from 11 a.m. – 11 p.m.  (*Id.*)  His rate of pay was $50 per day; he was informed of this rate orally and told that he could receive tips from customers.  (T. 9.)  He testified that there was no "time recording system" to track his hours.  (T. 15.)  Instead, to collect his bimonthly salary, Zou would sign "a piece of paper" that the manager would retain, and then he would receive his salary.  (*Id.*)  He would keep any cash tips, and then the "front desk girl" would calculate any tips received through online platforms or credit cards and pay him at the end of each day.  (T. 16.)

Zou identified Defendant Wu as the "general manager" who was "in charge of everything" including his salary and assignment of work.  (T. 11.)  Defendant Zun Bi Chen was also a "boss," who was often at the front desk managing the restaurant.  (T. 11-12.)  During his time at Hunan Balcony, Zou testified that Wu would sometimes send him to Szechuan Garden at 239 West 105th Street "to go there and help out with deliveries" when that restaurant was busy, which was typically three or four times per week.  (T. 11, 19.)  He further testified that during his time working between both restaurant locations, his base salary was the same and always paid through Hunan Balcony.  (T. 20.)

Plaintiff Zou stopped working for Hunan Balcony by December 31, 2012.  Then, sometime in April 2013, he received a phone call from Ah Pao who asked him to come

---

[5] "Ah Pao" was a manager of Hunan Balcony and Szechuan Garden, but none of the witnesses were confident of this individual's full name, title, or dates of employment. He was not called as a witness. (*See* T. 99, noting that Plaintiff Zou "[doesn't] know [Ah Pao's] actual name.")

work part-time at Szechuan Garden on 239 West 105th Street. (T. 21-22.) Zou worked there only one or two days per week, and performed only food deliveries. (*Id.*) His hours on those days were typically 12 p.m. – 10 p.m. with a one-hour lunch break and short break for dinner, which he believes he recorded through a mechanical time-punching machine. (T. 21-22, 26, 27.)

Zou testified that Wu was a "manager" at Szechuan Garden and had responsibilities for payment and organization. He testified that he believed that Defendant Chen was also a manager at Szechuan Garden, though he did not give Zou instructions directly. (*Id.*) As at Hunan Balcony, Zou received bimonthly installment payments and signed a piece of paper in order to receive his payment, typically from Wu. (T. 27.) Zou testified that he did not execute an employment agreement at the start of the relationship. (*Id.*) Unlike Hunan Balcony, however, he was unsure of his rate of pay: "I think they pay me by the hour. I don't really know."[6] (T. 28.)

Plaintiff Zou's testimony is unclear regarding exactly when he stopped working for one or two days per week at Szechuan Garden. He was never asked the question directly, but instead mentioned that "something happened to one of my [children] so I didn't work and I went home and I took care of my child." (T. 29.)

---

[6] On cross-examination, Plaintiff Zou testified that he accepted whatever amount Szechuan Garden paid him, regardless of hours that he worked, and never questioned his payments: "I didn't ask. Every time I was paid . . . that's the amount I made my deposit." (T-93.) Some of his testimony on this point lacks credibility. After acknowledging that these were not his first jobs in the food industry, he was asked: "Is it your practice when you go get a job to just accept whatever they decide to pay you regardless of how long you work or what you do?" (T. 93.) He answered: "I only worked there for one day [a week] so I was afraid to – I was afraid to ask." (T. 94.)

6

From November 20, 2014 through April 30, 2016, Plaintiff Zou worked for A New Saigon, located at 2596 Broadway – a different restaurant at the same address that Hunan Balcony previously occupied. (T. 30, 35.) He began there the same day that the restaurant opened. (*Id.*) According to Zou, Defendant Wu, Defendant Chen and Ah Pao were all present at A New Saigon during his employment there. (T. 31.) Wu was "managing" and responsible for "giving out pay" though she was apparently not there every single day. (T. 32.)

Most of Zou's work at A New Saigon involved delivering food, although he also performed other tasks, such as cleaning. (T. 31 His daily work assignments were generally given by Ah Pao. (*Id.*) Zou testified that he was paid $50 per day and worked approximately six days per week from 11 a.m. to 11 p.m. with short breaks for lunch and dinner. (T. 34, 36-37.) Once again, he did not sign any agreement at the start of his work but was verbally notified of the rates and hours. (T.33-34) The restaurant had no punch-clock for tracking his time. (T. 37.) And again, as with Hunan Balcony and Szechuan Garden, Zou was asked to sign a piece of paper that he did not read, and that the restaurant would keep, before receiving his bimonthly pay. (T. 38, 44.) Tips were handled in the same manner as well; Zou would retain any cash tips without reporting them, and then would meet with the person at the front desk at the end of each night to collect any tips paid by credit card or online provider. (T. 39-40.)

During the same period that Zou worked at A New Saigon (November 20, 2014 through April 30, 2016), Wu or Ah Pao would occasionally send him to handle deliveries for Szechuan Garden at 239 West 105th Street when that location was "too busy." (T. 42.) The trial testimony on this arrangement was inconsistent and far from clear; at one

point, Zou indicated that he stopped working at Szechuan Garden at the end of 2013, but at other points, he indicated that between 2014 and 2016, he worked for both locations "seven days a week." (T. 47.) He stated that he did not receive a separate paycheck from Szechuan Garden from the days when he worked there other than the monies he received from A New Saigon, which he claimed encompassed his work for Szechuan Garden. (T. 104-105.) Zou stopped working at A New Saigon when the restaurant closed. (T. 50.)

Zou admitted that he was unaware of the formal corporate entities or ownership interests in the restaurants. (T. 84-85.) Rather, he only recognized the names of the restaurants in Chinese and recognized the individuals who appeared to be managers, though he did not know with certainty who owned the businesses. (*Id.*)

On cross-examination, defense counsel elicited testimony from Zou's deposition that was inconsistent with his testimony at trial. For instance, while testifying at trial that he received only $50 per day, working six days a week with only short breaks for meals (T. 9), on cross-examination, Zou testified to a substantially different arrangement: "They paid me, yea. They told me about my pay [from the beginning]. I was paid $1,430, worked five full days, and I take two half days off a week." (T. 63; Zou Deposition at 8, line 20.) Oddly, Zou seemed to forget that he ever was deposed in the case, and claimed that he did not recognize defense counsel.[7] When asked by defense counsel at trial if he recalled meeting him at the December 7, 2017 deposition, Zou stated: "I forgot. I don't remember. . . . I totally forgot. I don't even recognize you." (T. 52.) Plaintiffs' counsel, however,

---

[7] Zou's deposition transcript, dated December 7, 2017, was admitted into evidence as Court Exhibit 1.

confirmed that his client in fact had been deposed by defense counsel. (T. 53.) The Court does not find Zou's lack of memory of being deposed by defense counsel to be credible.

## 2. Plaintiff Chen

In approximately November 2014, Plaintiff Chen passed by A New Saigon on 2596 Broadway – which had not yet opened – "[b]y happenstance" and inquired whether they might be looking for workers. (T. 116) Chen left his phone number and received a call from "Lau Gui," who invited him to begin working there on the opening day of the new restaurant.[8] (T. 120) When he arrived to begin work, Chen was greeted by Ah Pao as one of the managers and also came to know "Boss Chen" (that is, Defendant Chen) and Defendant Wu as other supervisors. (T. 117.) Plaintiff Chen also identified Gui as a supervisor there. (T. 122.) Chen testified that he worked at A New Saigon from November 2014 through February 2016. (Id.)

Like Plaintiff Zou, Plaintiff Chen claimed that he did not have any formal interview with anyone at A New Saigon, nor any initial discussion of his hours or wages. (T. 119-120.) Once he started there, Ah Pao informed Plaintiff Chen that his wage would be $50 per day, six days per week, between 11 a.m. and 11 p.m. (T. 120.) Plaintiff Chen would take ten-minute breaks for meals at approximately 3 p.m. and 9 p.m. each day. (T. 123.) There was no formal time-keeping mechanism to track his hours. (T. 124.) Like Plaintiff Zou, Plaintiff Chen did not receive any written documentation about this information, nor did he receive any information about tips. (T. 120.)

---

[8] At varying points in the transcript, "Lao Gui" and "Lin Gui" are used interchangeably to refer to the same individual who served in a managerial capacity at A New Saigon. No witness identified his full name, title, or dates of employment.

During his time at A New Saigon, Plaintiff Chen largely delivered food orders, and handled other tasks in the restaurant when directed, such as "mov[ing] soda," "cut[ting] cardboards" and "mak[ing] sauces." (T. 122.) He received payment twice per month, and like Plaintiff Zou, was required to sign a piece of paper upon receipt of payment from either Wu or Ah Pao depending on who gave him his payment. (T. 125.) Plaintiff Chen also received tips in the same manner; he kept all cash tips, and at the end of each day, would go to the front desk to receive cash for tips from orders placed on online platforms or paid by credit card. (*Id.*) Plaintiff Chen stopped working at A New Saigon in February 2016 following an accident on his motorbike. By the time he had recovered, the restaurant had already closed.[9] (T. 126.)

During his time working for A New Saigon, Plaintiff Chen occasionally would be asked to handle deliveries at Szechuan Garden for about two or three hours each week: "Lunchtime, if the boss called from up there, I would go up there to help . . . . The boss of 105th Street would call the manager down there [to 2596 Broadway] and the manager would take whoever is free to help out." (T. 127-128, 167.) Plaintiff Chen identified the "boss" of 105th Street as Defendant Wu, and the "manager" at 2596 Broadway as Ah Pao. (T. 128.) Like Plaintiff Zou, Plaintiff Chen did not receive separate compensation for work performed at Szechuan Garden; he received all his pay from A New Saigon. (T. 129.)

On cross-examination, Plaintiff Chen was confronted with his prior deposition testimony in which he made several statements conflicting with his testimony on direct

---

[9] During redirect examination, Plaintiffs introduced into evidence Plaintiffs Exhibit 15, a copy of a menu for the same restaurant that was titled, "Saigon 98" rather than "A New Saigon." Plaintiff Chen testified that both names described the same restaurant for which he worked between November 2014 through February 2016, though he was not sure when the name shifted. (T. 199-200.)

examination at trial.[10]  In his deposition, Plaintiff Chen stated that he was hired by Lau Gui and told that he would receive $1,700 per month (rather than $50 per day).[11]  (T. 136; *see* Plaintiff Chen Deposition at page 17, line 3.)  During his deposition, Plaintiff Chen was asked about the identity of his boss at A New Saigon.  He answered: "I didn't know who the boss – who was the boss, because the manager said just wait for the boss to pay you.  So after waiting for three months, I never got my wages."  Clarifying, defense counsel asked: "You never got to meet the boss?"  Plaintiff Chen answered: "No." (T. 138; *see* Deposition at page 37, line 8.)  At trial, however, Plaintiff Chen specifically named Defendant Wu and Defendant Chen as holding the role of "boss" along with Ah Pao, noting that he regularly saw them and received instructions from them.  (T. 138.)  At deposition, Plaintiff Chen testified that "I was never paid by a woman"; however, at trial, he testified that he was paid by either Defendant Wu (a woman), Ah Pao or Gui. (T. 151; *see* Deposition at page 12, line 4).

At his deposition, Plaintiff Chen was asked whether he knew Wu.  He replied: "She came by once in a while.  Rarely had much interaction with her."  But during trial, he testified that she was "often" in the restaurant and regularly gave him his wages.  (T. 152; *see* Deposition at page 17, line 21.)  At trial, Plaintiff Chen was asked whether Defendant Wu ever paid him his wages.  He responded: "She did."  (T. 153.)  But during his deposition, defense counsel asked him, "She never paid you your salary, did she?"  And

---

[10] Plaintiff Chen, like Plaintiff Zou, did not recall his deposition on December 7, 2017 with defense counsel and did not recall meeting defense counsel on any prior occasion.  (T. 135.)  The Court does not find his lack of memory of his deposition to be credible.

[11] Plaintiff Chen's deposition transcript, dated December 7, 2017, was admitted into evidence as Court Exhibit 2.

Plaintiff Chen replied, "No, never." (T. 153; *see* Deposition at page 18, line 7.) When asked again at trial whether Defendant Wu ever paid him after hearing his prior deposition testimony, Plaintiff Chen replied, "I don't know."[12] (T. 153.)

In short, Plaintiff Chen appears to have significantly altered his narrative between his deposition in December 2017 and trial in 2019. At trial, Plaintiff Chen pointedly emphasized Defendant Wu's personal involvement in A New Saigon, testifying that she paid him directly and managed the restaurant. The Court does not find this shift in narrative to be credible given the many inconsistencies and lapses in Plaintiff Chen's testimony.[13] More likely, Plaintiff Chen realized that Wu would need to be characterized as his supervisor in order to support a theory of joint and several liability and establish that she owned or managed A New Saigon along with Szechuan Garden.

Overall, based on both their testimony and demeanor at trial, the Court did not find either Plaintiff to be credible. Indeed, both Plaintiffs appeared nervous and uncertain of their testimony, and regularly looked toward Plaintiffs' counsel as if seeking guidance.

## B. Defendants' Businesses and Practices

Defendant Wu testified as the sole witness for Defendants. Between about 2004 and 2009, she served as a non-owner manager of a restaurant located on 2596 Broadway

---

[12] Other aspects of Plaintiff Chen's testimony lacked credibility. For example, he stated that he spoke with Lau Gui about the fact that he had not been paid for three months and he was told that the "boss" would eventually pay, so he continued to work for A New Saigon. (T. 141-142.) The Court has a difficult time believing that Plaintiff Chen would continue to work over such a lengthy period without any remuneration or assurance beyond that single conversation with Lau Gui, particularly if Defendants Wu and Chen were frequently in the restaurant serving in a managerial role.

[13] At one point, the Court specifically warned Plaintiffs' counsel to "be careful with this witness" because of the readily apparent changes in his testimony. (T. 207.)

known as Hunan Balcony. (T. 218, 253-255.) During that period, the restaurant was owned by an entity called Wah Nan Restaurant Corporation. (T. 260.) Defendant Wu became an owner of that restaurant in 2009 when she registered an entity known as H.B. Restaurant Group, Inc., and Wah Nan Restaurant Corporation assigned her its lease. She continued to do business under the trade name Hunan Balcony and apparently retained most of their kitchen supplies, employees, and furnishings. (T. 218-219, 255, 260-261.) That restaurant did business under Wu's ownership between June 1, 2009 and February 28, 2014, ultimately closing due to increasing rent and overhead costs. (T. 219-220.)

Wu testified to a lease assignment from H.B. Restaurant Group, Inc. to SG 98 Restaurant Group, Inc., permission for which was obtained from the landlord.[14] (T. 221-222 and Exhibit C.) Wu was asked repeatedly whether she was "associated, affiliated to, in business with, or in any way related to SG 89 Restaurant Group, Inc.," and she repeatedly stated that she was not. (T. 223-224.) In handling the assignment, she met Defendant Chen, whom she called "Kevin Chen." (T. 261.) "So I wanted to leave, and Kevin wanted to have a restaurant. And I surrender my lease, and he wants to open up there, and I still have four years remaining on my lease . . . . And I operate there until February 28 [of 2014], and I leave after that." (T. 262.) On cross-examination, Wu stated

---

[14] The testimony regarding the addresses and locations became slightly muddied at times in the transcript. For clarity, the assignment indicates the address of "220 West 98th Street" because the entrance to the building (owned by 220 98th Street, LLC) is located on 98th Street, even though the restaurant itself is located on Broadway. (T. 222-223.) During trial, there was testimony that J&K Restaurant Group, Inc. shows an official address as "600 West 111th Street" because that is the address of the office that filed the incorporation paperwork on behalf of Defendant Wu. (T. 230.)

that Defendant Chen had no management or administrative role at Szechuan Garden, and to her knowledge, never sent any of his workers to her restaurant. (T2. 16.)

After assumption of the lease in 2014, Wu no longer had any connection to 2596 Broadway, nor did she do business under the H.B. Restaurant Group, Inc. entity. (*Id.*) Instead, she formed an entirely new business entity called "J&K Restaurant Group, Inc." and did business under the trade name "Pitaya," which served Japanese food at 239 West 105th Street. (T. 224-225.) Pitaya began operations on July 1, 2013, approximately seven months before Hunan Balcony closed.[15] (T. 226.) Hunan Balcony had served Chinese food. (T. 225.) A New Saigon served Vietnamese food, and Defendant Wu testified that she has never in her career been involved with any restaurant that served Vietnamese food (which would include A New Saigon). (T. 225.)

On March 7, 2014, Wu decided to change her Pitaya restaurant from Japanese cuisine to Szechuan cuisine, noting that "[the] Japanese food business is not so good." (T. 232.) Accordingly, she changed the name of the restaurant to Szechuan Gourmet. However, when her head chef left the business, she changed the name once more to Szechuan Garden on approximately March 11, 2015. (T. 233-234.)

Under all three trade names – Pitaya, Szechuan Gourmet and Szechuan Garden – Wu's restaurant operated at 239 West 105th Street; Wu had no relationship or communication with the business at 2596 Broadway.[16] (T. 234.) Wu did visit the

_____

[15] The lease for Pitaya began on January 15, 2013, but because the space needed significant improvements, the restaurant did not open until about six months later. The landlord gave J&K Restaurant Group, Inc. an abatement for this period. (T. 228; *see* Defendants' Exhibit D.)

[16] The Court heard a great deal of testimony, particularly during Defendant Wu's cross-examination, about her relationship to these addresses and the individuals who helped

restaurant at 2596 Broadway, but "as a customer" for the grand opening of A New Saigon and a couple other occasions. (T. 235.) She knew two of the owners of SG Restaurant Group, Inc. "[t]hrough referral, introduction of friends." (T. 236.) But she did not have any business relationship with those individuals, and she had no connection to management of the restaurant. (*Id.*)

Wu closed Szechuan Garden on April 30, 2017, dissolved J&K Restaurant Group, Inc., and has not run any other restaurants since then. (T. 249, 267.)

As for her relationship with the named Plaintiffs, Wu admitted that she had previously employed Zou for a brief period, although she did not remember him until receiving notice of this lawsuit. She testified that while she was operating Szechuan Garden at 239 West 105th Street, Zou worked one day per week for eight weeks to deliver food orders. (T. 237.) Wu assumed that "[because] [h]e only worked at my place one day a week . . . he probably was working somewhere else." (*Id.*) She denied that Zou ever worked overtime (more than 40 hours per week) or even close to that. (T. 247.)

Wu testified that she presented Zou with the document admitted into evidence as Defendants' Exhibit A – a wage notice sheet – "[t]o notify him that we're paying him $6 per hour" and taking a tip credit, because he would receive tips on the job. (T. 240.) She further testified that Zou was paid by check on all occasions, and that she could see from her bank account that those checks were deposited. (T. 243-244.) Whenever employees received their paycheck, Wu would have them sign a wage statement just like the one signed by Zou. (T. 243; *see* Defendants' Exhibit A.) Sometimes, Wu would physically

---

her to register corporate names and change d/b/a names. None of this testimony proved relevant to the facts at issue in this dispute. (*See, e.g.*, T2. 4-16.)

give the paycheck and receive the signed wage statement herself, and other times she would delegate that responsibility to a manager. (T. 280.)

As for Plaintiff Chen, Wu firmly denied ever employing him. (T. 244.) Wu noted that she was unable to locate any wage statements of the nature signed by Zou for Plaintiff Chen, and that she had never met him or knew his name before this lawsuit. (T. 244.)

Wu denied the testimony of both Plaintiffs that delivery workers would be sent from the restaurant at 2596 Broadway to the restaurant at 239 West 105th Street. (T. 237-238.) Her testimony at trial was wholly consistent with her deposition testimony in which she was asked: "Did you have an agreement with anyone from SG 98 Restaurant Group Incorporated about sharing deliverymen?" And she replied: "No. Any employee can work anywhere. . . ." (T. 285; *see* Wu Deposition at page 39, line 24.) She also emphasized that for business reasons, she was careful to ensure that all employees "would be on the book" and would work "under 40 hours" since "no business want[s] to provide overtime for their worker[s] these days." (T. 288.) Wu's testimony during cross-examination was consistent as well. (T2. 16.) She also testified that she has never had any management role or financial interest in A New Saigon, and she does not know the current owners. (T2. 33.)

Generally, considering her testimony and observing her demeanor, the Court found Wu to be extremely credible. She answered questions forthrightly and appeared to be honest in her responses, an impression bolstered by the fact that her testimony remained essentially consistent during her deposition, direct examination at trial, and cross-examination at trial.

## Conclusions of Law

Plaintiffs brought this action to recover unpaid wages, overtime wages, and other damages under the FLSA and NYLL. Specifically, Plaintiffs seek to recover (i) unpaid minimum and overtime wages; (ii) spread of hours damages; (iii) damages for failure to provide an annual notice of wage rate; (iv) damages for failure to provide wage statements and failing to maintain and preserve those payroll records; (v) equipment reimbursement[17]; (vi) liquidated damages; and (viii) costs and reasonable attorneys' fees, as well as; (ix) prejudgment interest at the rate of nine percent per annum on their NYLL claims. The Court outlines the relevant legal standards below, and then applies them to the facts adduced at trial. Because the Court ultimately concludes that there is no basis for liability against Defendants, it does not recite the separate standards for the various categories of damages.

### A. Burden of Proof

In order to recover on their FLSA and NYLL claims, Plaintiffs bear the burden of proving their claims and damages by a preponderance of the evidence. *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 359-361 (2d Cir. 2011). To establish liability on a claim for underpayment of wages, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel,* 643 F.3d at 361; *see also Tapia v. Blch 3rd Ave. LLC*, No. 14 Civ.

---

[17] In addition to their work hours, both Plaintiffs testified that they purchased motorbikes specifically to allow them to work for Defendants. *See* T. 40-41 (describing Plaintiff Zou's motorbike); T. 126-127 (describing Plaintiff Chen's motorbike). While this is a minor point, the Court does not find these statements to be credible, given that both Plaintiffs apparently served as deliverymen for multiple restaurants before and since, and Plaintiffs did not include any receipts regarding these alleged purchases in their submissions.

17

8529, 2016 WL 4581341, at *4 (S.D.N.Y. Sept. 1, 2016) (observing that under the FLSA and the NYLL, "[p]laintiffs bear the burden of proof to establish all claims and damages by a preponderance of the evidence"); *Espinosa v. Abraham Refrigeration Corp.*, No. 18 Civ 8855, 2019 WL 2725539, at *1 (S.D.N.Y. July 1, 2019) (noting that in FLSA and NYLL cases, "Plaintiff has the burden of proving his case by a preponderance of the evidence"); *De Xiong Pan v. Wei Plumbing, Inc.*, No. 12 Civ. 1781, 2013 WL 6053496, at *13 (S.D.N.Y. Nov. 13, 2013) (same).

"To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). *See also Abrams v. United States*, No. 66 Civ. 1585, 1970 WL 432, at *1 (S.D.N.Y. Nov. 19, 1970) ("To establish by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, preponderance of the evidence means such evidence as, when considered and compared with what is opposed to it, has more convincing proof and produces in your mind belief that what is sought to be proved is more likely true than not true"); *Metropolitan, S.A. v. DGM Commodities Corp.*, No. 13 CV 1521, 2013 WL 5502818, at *2 (E.D.N.Y. Oct. 2, 2013) (same).

In the context of a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited. And as the trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Java v. El Aguila Bar Restaurant Corp.*, No. 16 Civ. 6691, 2018 WL 1953186, at *2 (S.D.N.Y. April 25, 2018) (internal quotations omitted) (quoting *Krist v. Kolombos Restaurant Inc.*, 688 F.3d 89, 95 (2d Cir. 2012)).

## B. Applicable Law Under FLSA and NYLL

The FLSA's minimum wage and overtime provisions apply to employees who are "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1). Under the FLSA, an employee seeking to recover unpaid wages from an "employer" has the burden of proving that "he performed work for which he was not properly compensated." *Fujun Jiao v. Shi Ya Chen*, No. 03 Civ. 165, 2007 WL 4944767, at *2 (S.D.N.Y. March 30, 2007) (internal quotations omitted).

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d). To determine whether an individual is an "employer" under the FLSA, the Second Circuit utilizes the economic realities test, which focuses on "whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104-105 (2d Cir. 2013) (citation omitted); *see also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (applying factors in FMLA context). In addition, the analysis depends on whether the defendant had "operational control" over employees. *Irizarry*, 722 F.3d at 110. Operational control does not necessarily require direct contact with employees and workplaces.[18] The statutory standard for employer status under the NYLL "is nearly

---

[18] Relevant here to Defendant Wu, an individual can face liability for overtime and unpaid wage claims under the FLSA and NYLL because an employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *Hernandez*, 2016 WL 3248493, at *22 (noting same standard for NYLL). Generally, "an employer may include an individual owner who exercises a sufficient level of operational control in the company's employment of employees." *Kalloo v. Unlimited Mechanical Co. of NY, Inc.*, 977 F. Supp. 2d 187, 201 (E.D.N.Y. 2013) (citing *Irizarry*, 722

identical to that of the FLSA." *Hernandez v. JRPAC, Inc.*, No. 14 Civ. 4176, 2016 WL 3248493, at *22 (S.D.N.Y. June 9, 2016); *see also Switzoor v. SCI Engineering, P.C.*, No. 11 Civ. 9332, 2013 WL 4838826, at *6 (S.D.N.Y. Sept. 11, 2013) (noting that the courts of the Southern District of New York have applied the same employer analysis to the FLSA and NYLL); NYLL §§ 190(3), 651(6).

To establish liability under the FLSA for improperly compensated overtime work, an employee must prove that: (1) they performed work for which they were not properly compensated, and (2) their employer had actual or constructive knowledge of that work. *Kuebel*, 643 F.3d 352, 361 (2d Cir. 2011). An employer has the duty to maintain accurate records of its employees' hours. *Id.* at 363; *see also Lynch v. City of New York*, 291 F. Supp. 3d 537, 546 (S.D.N.Y. 2018); 29 U.S.C. § 211(c) (requiring employers subject to the FLSA to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"). This record-keeping duty is "non-delegable." *Kuebel*, 643 F.3d at 363. "In other words, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Id.*

---

F.3d at 104-11); *but see Switzoor v. SCI Engineering, P.C.*, No. 11 Civ. 9332, 2013 WL 4838826, at *6 (observing that "[a] person may not be held individually liable for a company's FLSA violations simply because he was an executive of that company"). In determining whether an individual is an "employer," courts consider the same factors that apply to corporations, namely "whether the individual: '(1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Gillian v. Starjam Restaurant Corp.*, No. 10 Civ. 6056, 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011).

"[I]f an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount of [the uncompensated work] as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 652, (internal quotations omitted) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 684-685, 693 (1946) *superseded by statute on other grounds as stated in Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 519 (2014)); see also *Marcelino*, 2018 WL 1517205, at *15 (describing courts as employing a burden shifting scheme in instances of incomplete records when determining liability and damages). . In such instances, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 362; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1040 (2016) (finding that statistical evidence could provide such an inference for a class of employees). The Second Circuit has noted that this burden "is not high" and may be satisfied through an employee's "estimates based on his own recollection." *Kuebel*, 643 F.3d at 362.

While a plaintiff's recollection, alone, may be sufficient to establish a rebuttable presumption that he worked certain hours for which he was not compensated, "such testimony only establishes such a presumption if the testimony is credible." *Java*, 2018 WL 1953186, at *2 (internal quotations omitted) (quoting *Romero v. Rung Charoen Sub, Inc.*, No. 16 Civ. 1239, 2017 WL 4480758, at *4 (E.D.N.Y. Sept. 30, 2017)); *see also Daniels v. 1710 Realty LLC*, 497 Fed. App'x. 137, 139 (2d Cir. 2012) (summary order) (affirming the district court's determination that plaintiff did not meet his burden because the testimonial evidence he presented was not credible).

If an employee satisfies this initial showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Tyson Foods*, 136 S.Ct. at 1047 (internal quotations omitted) (quoting *Anderson*, 328 U.S. at 687); *see also Kuebel*, 643 F.3d at 362. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may only be approximate." *Gonzalez v. Masters Health Food Service, Inc.*, No. 14 Civ. 07603, 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (internal quotations omitted) (quoting *Kuebel*, 643 F.3d at 362). A similar burden-shifting framework applies under both the FLSA and the NYLL. *Canelas v. World Pizza, Inc.*, No. 14 Civ. 7748, 2017 WL 1233998, at *9 (S.D.N.Y. March 31, 2017).

## C.   Discussion

One issue is dispositive in this case: did Plaintiffs meet their burden to establish by a preponderance of the evidence that they worked more than 40 hours per week, received less than minimum wage, or suffered some other wage-and-hour violation while working for any restaurant managed, owned or otherwise controlled by any of the Defendants. The Court finds that they did not.[19]

With respect to Plaintiff Zou, the evidence established that the only restaurant at which he worked for or under Defendant Wu is Szechuan Garden. Both Zou and Wu's

---

[19] Plaintiffs presented no evidence beyond their own testimony that Defendant Chen managed, owned or controlled any restaurant at which either Plaintiff worked. As previously noted, Defendant Chen has not answered the Complaint, nor was he called to testify at trial. Plaintiffs never moved for default against him, or otherwise addressed his status. Accordingly, the only Defendant on which this Decision and Order focuses is Defendant Wu and the restaurants that she is alleged to have managed, owned or controlled.

testimony and contemporaneous payroll records show that Zou worked there only one day a week for eight hours a day. To the extent that Zou claims he was underpaid or subject to some other violation of the FLSA or NYLL, the sole supporting evidence is Zou's own testimony. The Court, however, does not credit that testimony for the reasons stated earlier. *See Ortega v. JR Primos 2 Restaurant Corp.*, No. 15 Civ. 9183, 2017 WL 2634172, at \*4 (S.D.N.Y. June 16, 2017) (where a FLSA plaintiff's testimony is found to be inconsistent or not credible, the court must resolve factual dispute in favor of defendants); *Gallego v. Adyar Ananda Bhavean Corp.*, No. 16 Civ. 4631, 2018 WL 4735710, at \*6 (S.D.N.Y. Sept. 30, 2018) (considering trial testimony and declining to credit plaintiffs' recollections of hours and pay because such testimony was inconsistent, unsupported, and contradicted by defendant's payroll records ); *Lugardo v. Prima Pasta & Cafe, Inc.*, No. 11 CV 1222, 2013 WL 1386160, at \*2 (E.D.N.Y. April 4, 2013) (finding that "Plaintiff did not offer any evidence to corroborate his claim that he worked as a dishwasher and pizza preparer at the restaurant"). Plaintiffs failed to prove by a preponderance of evidence that Zou was subject to any FLSA or NYLL violation while an employee of Szechuan Garden.

Plaintiffs also have not proven that Zou worked for any other restaurant that Wu owned, controlled or managed. While Zou very well may have worked for A New Saigon, Defendant Wu did not own that restaurant. Wu explicitly denied any ownership or management of A New Saigon. Tr. 235-236. Meanwhile, Wu credibly demonstrated that she previously owned a restaurant in the same location as A New Saigon but relocated her business (and changed its name) prior to Zou's work there. T.224-225. Her testimony in that regard was further supported by the lease transfer submitted into evidence. There

simply is no evidence in the record, beyond Zou's testimony, that Defendant Wu was even present at A New Saigon in any capacity other than as a customer. Again, the Court did not find Zou's testimony credible and certainly not sufficient to prove by a preponderance of the evidence that Wu owned, controlled or managed A New Saigon at any time that Zou worked there. *See Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 498 (S.D.N.Y. 2010), aff'd sub nom. *Magnoni v. Smith & Laquercia*, 483 F. App'x 613 (2d Cir. 2012) ("[Plaintiff's wage-and-hour] case relied almost entirely on her testimony to establish the amount of overtime she worked . . . [and her] credibility as a witness was therefore key to her prevailing on any of her claims. The Court concludes that [Plaintiff] was not a credible witness [at trial]").

Similarly, Plaintiff Chen failed to prove by a preponderance of the evidence that he worked at a restaurant owned, controlled or managed by Wu at any time. While payroll records corroborated payments to Plaintiff Zou for his part-time work at Szechuan Garden, no payroll records were brought forth for Plaintiff Chen. Wu has no memory of ever seeing Plaintiff Chen, let alone working with him, and no documentary evidence or third-party witness contradicts her. As already noted, the Court finds Plaintiff Chen to be a non-credible witness, even more so than Zou, given his demeanor at trial and the many contradictions between his deposition testimony and his trial testimony. The Court thus does not credit Plaintiff Chen's testimony about Wu's involvement, the hours Chen worked, or the pay he received.[20]

---

[20] This is yet another instance in which Plaintiffs' counsel – Troy Law PLLC – has submitted conflicting sworn testimony. *See, e.g.*, *Zhang v. Sabrina USA, Inc. et al.*, No. 18 Civ. 12332, 2019 WL 6724351, at *3 (S.D.N.Y. Dec. 10, 2019) ("The Court is concerned, however, about the discrepancies regarding key facts that would be difficult to classify as a mere mistake"); *Gao v. A Canaan Sushi Inc.*, No. 18 Civ. 6442, ECF 29

Plaintiffs do not gain any ground by characterizing that some combination of Hunan Balcony and A New Saigon (at 2596 Broadway) and Szechuan Gourmet and Szechuan Garden (at 239 West 105th Street) acted as a "joint enterprise" for which Plaintiffs performed work at both locations at the direction of Defendant Wu. (T. at 5; Pl. B. ¶¶ 62-64) That is because Plaintiffs failed to prove this theory, or point to any evidence in the record to support it. For example, Plaintiffs do not establish that the allegedly intertwined businesses are exchanging monies, communications, phone calls, or business records between and among them – all of which would be expected if the restaurants (or their parent companies and owners) were truly doing business in concert. No such documentary evidence or corroborating third-party witness testimony was introduced at trial to connect Defendant Wu to any other business entities.

In short, Plaintiffs have not met their burden to demonstrate by a preponderance of the evidence that either of them worked more than 40 hours per week, received less than minimum wage or incurred some other wage-and-hour violation while working for any restaurant managed, owned or otherwise controlled by any of the Defendants who have appeared in this action. There thus is no basis by which those Defendants can be found liable whether individually or jointly and severally. Accordingly, judgment should

_____

(S.D.N.Y. July 18, 2019) (noting two affidavits by the same affiant that directly contradict each other); *Jianjun Chen v. 2425 Broadway Chao Restaurant*, LLC, 331 F.R.D. 568, 573-74 (S.D.N.Y. 2019) (sanctioning John Troy because the plaintiffs' deposition testimony contradicted earlier certified discovery responses); *Jianman Jin v. Shanghai Original, Inc.*, No. 16 Civ. 5633, 2018 WL 1597389, at *15 (E.D.N.Y. April 2, 2018) (finding "concerning" discrepancy between the plaintiff's sworn affidavit and subsequent deposition testimony). This course of conduct raises concerns about counsel's diligence in meeting ethical obligations to sufficiently investigate matters before they are filed and to guard against and take appropriate action with respect to submission of false testimony.

be awarded in favor of Defendants. *See Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 84 (S.D.N.Y. 2017) (defendant restaurant, which changed hands prior to employing plaintiffs, cannot be held liable under FLSA or NYLL where plaintiffs failed to establish continuity of ownership or successor liability); *Mateo v. Universal Language Corp.*, No. 13 CV 2495, 2015 WL 5664498, at *1 (E.D.N.Y. Sept. 24, 2015) (dismissing FLSA claim when plaintiff actually "was not employed by" defendant at relevant time period based upon findings of fact from testimony at hearing); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 265 (S.D.N.Y. 2008) (declining to impose individual FLSA or NYLL liability on the sister of restaurant's owner when her role was "fairly sketchy" based upon trial testimony, even though she possibly "assigned the deliverymen specific side work during periods when" owner was not at the restaurant).

## Conclusion

For the foregoing reasons, Plaintiffs have not met their burden of proof to establish liability against Defendants. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and close the case.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: January 9, 2020
     New York, New York

Copies transmitted to all counsel of record.